UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALANNA MAROTTA,

                    Plaintiff,

                                        CASE NO. 14-CV-11149
v.                                      HONORABLE GEORGE CARAM STEEH

FORD MOTOR COMPANY, et. al,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING IN
PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (DOC. #34)**

Plaintiff Alanna Marotta alleges that her employer Ford Motor Company and supervisors Michael Wendel, Michael Brudzinski and Thomas Garrity discriminated and retaliated against her, and sexually harassed her in the workplace. Plaintiff claims: Count I- Title VII Gender Discrimination; Count II- Title VII Gender Retaliation; Count III- Title VII Sexual Harassment; Count IV- Title VII Sexual Harassment Retaliation; Count V- ELCRA (Elliot-Larsen Civil Rights Act) Gender Discrimination; Count VI- ELCRA Sexual Harassment; Count VII- ELCRA Sexual Harassment Retaliation; Count VIII- ADA (Age Discrimination Act) Retaliation; and Count IX- PWDCRA (Persons With Disabilities Civil Rights Act) Retaliation.

Now before the court is defendants' motion for summary judgment on all claims (Doc. #34). The court held oral argument on July 16, 2015. For the reasons that follow, the motion will be granted in part and denied in part. Specifically, the court will grant summary judgment to defendants on all claims except the Title VII and ELCRA sexual harassment claims. As to the ELCRA sexual harassment claim, however, defendant Brudinski is entitled to summary judgment.

## I. BACKGROUND

### A. Relevant Work History

Plaintiff Alanna Marotta is currently employed by defendant Ford but has been on medical leave since March 22, 2013.[1] (Pl's. Ex. 32). She has worked for Ford since 1999. Plaintiff began her employment with Ford in Chicago at Ford's parts distribution center. Since 2003, however, plaintiff has worked in the packaging department at Ford's Brownstown, Michigan complex. (Pl's. Dep. 71:10-22).

When she began with Ford in 1999, plaintiff was trained and certified as a hi-lo driver. She subsequently received additional hi-lo training at Brownstown in 2003 and 2009. (Pl's. Dep. 27:4-28:2).

Plaintiff's husband, Angelo Marotta, also worked at the Brownstown complex. Angelo was elected UAW plant chairman in 2005 and served in this position until he lost the chairmanship to Bob Stover in 2011. (Pl's. Dep. 10:1-25, 11:6-11; 15:6-16:7).

### B. Plaintiff's Knee Injury and Work Restrictions/Ford's Alleged Violations

In 2004, plaintiff suffered a torn meniscus in her left knee while on the job. This required surgery and subsequent work restrictions: "limited walking to 2 hrs/day, stand 2 hrs/day, sit 4 hrs/day, sit-stand option while sitting; . . . no stand up driving; . . . sit-down hi-lo driving; minimal bending, stooping, kneeling or twisting of the left knee." (Pl's. Ex. 8-10).

Ford offers multiple job assignments for people with plaintiff's restrictions requiring a sit-stand option. These include: the "Jones" hand-pack machine, sub-kits, variable hand-pack work, and sit-down hi-lo driving. (Pl's. Ex. 10-11).

At the Brownstown complex, employees in the packaging department are often reassigned temporarily to other tasks or departments when there is no available work in the

---

[1] Plaintiff's psychiatrist, Bruce Sack, M.D., placed plaintiff on a psychiatric leave of absence because she was suffering from panic attacks.

packaging department. (Defs.' Ex. 5, ¶ 13). Employees with the least seniority are reassigned first. (*Id.*). Plaintiff alleges that two other employees, James Smith and Paul Bagwell, had similar medical restrictions as her but were treated more favorably because they were not moved to different assignments (like hi-lo driving) or were given more favorable assignments (namely, folding boxes). (Pl's. Dep. 341:23-343:3, 551:5-16; Pl's. Resp. 27).

Evidence proffered by defendants shows that James Smith was three-months senior to plaintiff. And Paul Bagwell worked in the sheet metal department, not the packaging department, and he did not share a common supervisor with plaintiff. (Defs.' Ex. 5, ¶¶ 8, 21). Moreover, Brownstown's human relations manager states that Bagwell is under different medical restrictions than Plaintiff. (*Id.* ¶ 21).

## C. Allegations of Sexual Harassment and Retaliation

Plaintiff alleges that she was subjected to sexual harassment and retaliation in the course of her employment with Ford. At her deposition, she testified to specific instances of harassment by coworkers and supervisors.

### 1. Coworker Harassment

Plaintiff testified at her deposition that one of her supervisors, John Balsam, was confronted by another supervisor about allegations made by one of plaintiff's co-worker's that Balsam was sexually involved with plaintiff. (Pl's. Dep. 181:20-25). In addition, prior to 2010, supervisor Terry Sikes told plaintiff that a co-worker accused Sikes of giving plaintiff certain assignments in return for sexual favors. (*Id.* at 174:9-16). The same employee, Pat Fisher, also made "sexual comments and gestures" about plaintiff and commented on plaintiff's rear end and tight pants. (*Id.* at 179:2-180:6).

In August 2012, an anonymous letter entitled "People Against Alanna" circulated in the Brownstown complex, criticizing plaintiff for "strutting up and down the aisles" and for "sitting

and socializing for 8-10 hours a day" "in her Sunday's best." (*Id.* at 214:17-19; Pl's. Ex. 5). The letter suggested that plaintiff was "still so bitter" about her husband losing his UAW Chairman position to Bob Stover. (*Id.*). Plaintiff reported the letter to the Labor Relations Office, and labor relations representative Cathie Padilla recommended opening a formal investigation into the "juvenile" letter. (Defs.' Ex. 4, ¶ 3, Ex. B). As part of the investigation, plaintiff identified several female coworkers, including Pat Fisher, as "bullies"; Padilla concluded that while these employees "admitted to a certain level of joking around," their actions were more accurately categorized as "game playing and horsing around." (*Id.* ¶¶5-6, Ex. G.) Padilla reviewed Ford's "zero tolerance" policy with each of these employees. (*Id.*)

In December 2012, plaintiff discovered work materials at her station with "U b***h" written on them, which she reported to Labor Relations. (*Id.*; Pl's. Ex. 7).

### 2. UAW Chairman Bob Stover Harassment

With regard to current UAW Chairman Bob Stover, plaintiff alleges specific instances of conduct that occurred in the workplace on different occasions: (1) Stover grabbed her hand forcefully and placed it on his abdominal muscles over his shirt to see how "fit" he was, despite plaintiff's insistence that she did not want to touch his abs; (2) he "put his chest against [plaintiff's], put his face against [her] jaw line and yelled in [her] face as he clenched his fists" and said "I am not afraid of you" during a fight regarding overtime, in which plaintiff responded by calling Stover "a fucking little liar, a little fucker, a piece of shit"; and (3) he called plaintiff "a fucking bitch" because  plaintiff told other employees about seeing Stover in a "compromising position" in a break area. (Pl's. Ex. 6). Plaintiff reported Stover's actions to Labor Relations representative Cathie Padilla in late August 2012. Padilla concluded that the incidents with Stover were stale and required no further action. (Defs.' Ex. 4, ¶¶ 5-6; Ex. G).

### 3. Supervisor Harassment

#### a. Greg DeAlexander

At her deposition, plaintiff testified that in 2006, supervisor Greg DeAlexander would act "very flirtatious," "com[e] up…in [plaintiff's] face," and "try to have conversations…on a personal level." (Pl's. Dep. 273:17-19). Plaintiff testified that it was going around the plant that DeAlexander was sexually involved with two woman at work, and she did not want him to pursue her. (*Id.* 273:23-274:5). Plaintiff says she ignored DeAlexander and his flirtatious behavior. (*Id.* 274:6-8). In response, DeAlexander allegedly "marked [plaintiff] AWOL when [she] was at work all day and wouldn't pay [her]. He said that [she] left early one day when [she] didn't." (*Id.* 274:8-11). Moreover, plaintiff testified:

> He took me off my job that I was placed on that job by the physical therapist department and medical department, and management took me off that job; went and had my restrictions changed in medical that was given to me by an IME.
>     Then he had me mop floors and told me I no longer have a sit and stand. And then as soon as I was done, he would walk on 'em and sarcastically make comments, oh, now you've gotta mop it again.
>     He was doing things like that to me.

(*Id.* 274:11-19).

#### b. Michael Wendel

Plaintiff also alleges sexual harassment by defendant Wendel. At her deposition, plaintiff testified that Wendel told plaintiff's co-workers that (1) he "had a hard-on all day" working with plaintiff; (2) he believed plaintiff's husband was unable to sexually satisfy her and that he "would love an opportunity because he knows he can"; and (3) he dreamt that he had sex with plaintiff and "it was so good [he] came back for seconds." (*Id.* 262:6-8, 296:6-11, 634:20-24). Additionally, plaintiff testified that Wendel made a comment directly to her that he "thought . . . was funny" about plaintiff "just want[ing] to do" another employee. After seeing

plaintiff hug that employee, Wendel sarcastically asked, "what about my hug[?]" (*Id.* 272:9-11, 282:1-6).

Plaintiff claims she reported Wendel's conduct in January 2013 to Crystal White-Philipo in Labor Relations. Moreover, plaintiff contends that she reported Wendel's conduct to Ford's hotline in March 2013. The report generated by Ford's hotline operator states that plaintiff reported "harassment." (*Id.* 286:1-288:25, 303:7-12; Pl's. Ex. 27-28; Defs.' Ex. 8).

### c. Thomas Garrity

Plaintiff alleges that defendant Garrity (1) deliberately touched her backside on four-to-six occasions while leaning over plaintiff's workstation to review problems with parts on a computer screen; (2) placed a black-colored part on her workstation and, laughing, asked, "so, is this how you like your men, black, huh?"; (3)  told plaintiff that the male workers spoke to her because they wanted to have sex with her; (4) stated to plaintiff that she looked "so hot today" and was "making [him] fuckin' horny." (Pl's. Dep. 276:13017, 280:1-11, 283:18-25, 323:9-12).

Plaintiff testified that she planned to complain about Garrity's conduct to plant manager Anthony Artis and supervisor Rick McGrath in 2012. (*Id.* 286:3-12). However, plaintiff ultimately chose not to mention Garrity's conduct during her meeting with Artis and McGrath because she believed she would have suffered further retaliation and harassment if she mentioned the harassment. (*Id.* 286:13-23).

### d. Michael Brudzinski

Plaintiff alleges that she was also harassed by defendant supervisor Michael Brudzinski when she worked for him in 2008 or 2009. She explained that, on one occasion, she witnessed Brudzinski staring at a co-worker's rear end. (*Id.* 317:24-318:1). The co-worker

turned around "and told him to stop staring at her ass. She was very upset and mad and yelled at him. She looked at me and said, did you see him staring at my ass?" (*Id.* 318:2-5).

Plaintiff testified that she also saw Brudzinski peering into the women's restroom. Plaintiff testified: "I remember coming out of the restroom and caught Mike standing and trying to look into the women's restroom, at the women's seating and the stalls, and I startled him, and I was very offended by this, and I told him if I ever catch him again lurking outside the women's restroom, peeking through the door I was gonna report him to labor relations. And I did report him to John Balsam for that." (*Id.* 318:19-25).

Plaintiff recalled a specific instance on March 21, 2013 where she walked into Brudzinksi's office to place a work order on his desk and found a pornographic article clipped to the back of one of her prior work orders. Plaintiff believes that one of the actresses featured in article resembles her. (Pl.'s Ex. 30). She reported the incident to the Labor Relations Office. (*Id.*).

**D. Allegations of Disability Retaliation**

**1. Plaintiff's Assignments to Other Machines**

In 2010, plaintiff was twice assigned to the main Jones machine for eight hours, causing pain in her left knee. (Pl's. Dep. 123:2-15; Pl.'s Ex. 12). When she complained, her supervisor responded "too bad, it wasn't my decision; [Wilson] put you there all day." (Pl.'s Ex. 20). Wilson told plaintiff's husband, then-UAW Plant Chairman Angelo Marotta, that he did not believe that the assignment was against plaintiff's restrictions. (*Id.*) In a February 2011 letter to William Clay Ford, plaintiff associates her assignment to the Jones machine with a political, union-related conflict between Wilson and her husband, not because of her alleged medical restrictions. (Pl.'s Ex. 18). Plaintiff also claims that she called Ford's harassment hotline to report the incidents. (Pl.'s Ex. 12).

Sometime in 2012, defendants Garrity and Brudzinski assigned plaintiff to a job that required her to sit continuously while working. (Pl's. Dep. 124:8-18). Garrity informed plaintiff that he "was telling [her] to work against [her] restrictions." (*Id.* 123:14-16). Brudzinski also allegedly told plaintiff that "everybody else works against their restrictions when [Brudzinski] asked them to." (*Id.* 126:2-4). When plaintiff reported Brudzinski's conduct, Garrity "told Mike to stop it." (*Id.* 126:16-22).

### 2. Plaintiff's Hi-Lo Driving Assignments

Around 2011 and 2012, plaintiff was assigned to hi-lo driving for eight hours per day. (*Id.* 126:4-8; Pl.'s Ex. 12). She told her supervisor numerous times that she was not comfortable hauling heavy loads in reverse on the hi-lo. (*Id.*). Moreover, her supervisor repeatedly had to stop her and instruct her to drive faster/ haul heavier stock. (*Id.*)

To accommodate her medical restrictions, plaintiff began taking short breaks from the hi-lo and expressed concern to Wendel and supervisor Rick McGrath. Wendel and McGrath instructed plaintiff to take short breaks. (Pl's. Dep. 127:8-128:7). Plaintiff claims that she experienced panic attacks because of her anxiety related to driving the hi-lo, and that she was taking medication to control the attacks. (Pl.'s Ex. 12).

### 3. Plaintiff's Reports to the Medical Department

Following both incidents on the Jones machine, plaintiff reported her concerns to the medical department and spoke with Dr. Gary LaKind, a plant physician. Dr. LaKind reviewed plaintiff's assignments and determined that they did not violate her restrictions. (Defs.' Ex. 7, ¶¶ 9-13, Ex. B).

Plaintiff again reported her concerns about driving the hi-lo to Dr. LaKind in March 2012. Dr. LaKind reminded plaintiff to limit her sit-down driving to four hours per day. (Pl's. Dep. 127:8-25; Defs.' Ex. 7, ¶ 14). In October 2012, plaintiff reported to the medical

department stating that she was suffering a panic attack. (*Id.*). The next day, plaintiff reported severe left knee and leg pain. (*Id.*; Defs.' Ex. 7, ¶¶ 15-18).

### 4. Plaintiff's Reports to Labor Relations

In August 2012, plaintiff informed her supervisor that she had taken anti-anxiety medication. She was sent to the medical department to sign a statement attesting that she felt comfortable driving the hi-lo while taking the medication. (Pl's. Ex. 12). However, plaintiff met with Artis and McGrath to express her concerns about being assigned work outside her restrictions. (Pl's. Resp. 15; Pl.'s Ex. 14). In response to plaintiff's concern that work was not getting done because she spent more time off of the hi-lo than on the hi-lo, McGrath told plaintiff, "this is what you asked for." (Pl's. Ex. 12).

Plaintiff raised a "health and safety concern" to Human Resources regarding her discomfort with driving the hi-lo. She was subsequently placed on a one-month "hiatus" from hi-lo driving. (Defs.' Ex. 5, ¶ 14; Ex. 8, ¶ 22). In November 2012, plaintiff complained to Labor Relations about hi-lo assignments, this time contending that they were above her skill level. She was informed that hi-lo driving was a component of her seniority level. (Pl's. Ex. 12). However, after this meeting, plaintiff was never assigned to hi-lo driving again. (*Id.*)

In January 2013, plaintiff spoke with Crystal White-Philpo regarding her medical restrictions. (Pl's. Ex. 12). Plaintiff also filed a written request for a reasonable disability accommodation, which was entered into Ford's system in March. (Pl.'s Ex. 24).

## E. Plaintiff's Disciplines and Grievances

Plaintiff was issued eight disciplines between April 2012 and March 2013 and filed several grievances related to these disciplines:

(1) 04/02/12: Reprimand and Warning plus 12 minutes time lost for failure to follow instructions (failure to pick up stock as directed); grievance withdrawn by union;

(2) 09/19/12: Reprimand and Warning for poor and careless workmanship (for packing 178 pieces with wrong part number); no outcome on grievance;

(3) 10/09/12: Reprimand and Warning plus one day and 12 minutes time lost for failure to follow instructions; grievance withdrawn by union as meritless;

(4) 10/11/12: Reprimand and Warning plus three days and 12 minutes time lost for failure to follow instructions; grievance withdrawn by union as meritless;

(5) 10/17/12: Reprimand and Warning plus balance of shift and one week time lost for failure to follow instructions; grievance withdrawn by union as meritless;

(6) 02/05/13: Reprimand and Warning plus balance of shift and one day time lost for poor and careless workmanship (for packing three of six boxes incorrectly on a quality audit); grievance partially settled and 11.3 hours' pay reimbursed;

(7) 02/14/13: no formal discipline, docked six minutes for being late to shift ($2.84); grievance withdrawn by union;

(8) 03/01/13: Reprimand and Warning for failure to meet or exert normal effort (for not meeting productivity standard); grievance denied.

(Pl's. Exs. 3, 13, 22, 23, 25, 26, 29; Defs.' Ex. 14, ¶¶ 3-5, Exs. A-I).

Plaintiff contends that she was never issued a discipline until Wendel began at the Brownstown complex. (Pl's. Resp. 3). At oral argument, defense counsel disagreed with plaintiff's representation and noted that disciplines are cleared from the system after 18 months. Plaintiff did not contest this assertion.

Plaintiff also testified that Wendel made comments to plaintiff's co-workers about the disciplines. When plaintiff asked to postpone a discipline hearing, Wendel allegedly told other employees "I hate that . . . bitch . . . I'm going to show her who's in charge. I want her out of this department." (Pl's. Dep. 641: 15-18). Plaintiff's grievance regarding the incident states that Wendel said "I can't stand her." (Pl's. Ex. 24).

**F. EEOC Charges**

In early 2013, Human Resources director Mary Carol Moody found that plaintiff was making unapproved modifications to how she performed her assignments that were not in

accordance with job safety standards and were negatively affecting her productivity. (Defs'. Ex. 5, ¶ 15). When plaintiff insisted that these modifications were necessary to accommodate her medical restrictions, Moody consulted with Dr. LaKind who agreed that an independent medical exam was needed to assess plaintiff's current physical capabilities; plaintiff's most recent exam on file was from 2006. (*Id.*, ¶ 16; Defs. Ex. 7, ¶ 24). Ultimately, an independent medical examination never took place.

Plaintiff filed two charges of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). In her first EEOC charge in February 2013, plaintiff alleged that her new manager was forcing her to work outside of her medical accommodations, that her co-workers were harassing her by passing out fliers around the plant, and that she was subject to continued retaliation for filing a grievance about the fliers. (Pl's. Ex. 27). Plaintiff told only a couple of co-workers about filing the February EEOC charge. (Pl's. Dep. 352:22-353:7).

In her second EEOC charge in May 2013, plaintiff claimed that she had been scheduled for an independent medical examination as retaliation for filing her first EEOC charge, and that Ford would not complete the investigation into plaintiff's report of sexual harassment until she returned to work. (Defs.' Ex. 9, ¶ 2, Ex. A).

This lawsuit was timely filed on March 18, 2014 within 90 days of plaintiff's second EEOC charge.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See*

*Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distrib. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be

evidence from which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

## III. DISCUSSION

Plaintiff's complaint raises both state and federal law claims. The court addresses each claim in turn. Although not bound by federal precedent, courts in the state of Michigan often look to federal case law when applying analogous Michigan law, particularly when the language is substantially identical. *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479 (6th Cir. 2006); *Comiskey v. Auto. Indus. Action Grp.*, 40 F.Supp.2d 877 (E.D. Mich. 1999); *Radtke v. Everett*, 501 N.W.2d 155 (Mich. 1993). Thus, where appropriate, the court considers federal case law in addressing the state-law claims.

### A. Time-Barred Allegations

As an initial matter, defendants contest the breadth of plaintiff's allegations, arguing that most of her claims are time-barred because of her failure to file suit within 90 days of receiving her first notice of right to sue from the EEOC. Specifically, defendants argue that all allegations predating March 11, 2013 are no longer actionable and cannot be considered. (Defs.' Mot. for Summ. J. 11-12). Defendants also argue that under Michigan's statute of limitations, any claims involving conduct that occurred more than three years before the filing of this suit — that is, before March 11, 2011 — are no longer actionable. (*Id.*). Plaintiff responds that under both state and federal law, evidence of time-barred events is admissible as background to demonstrate a pattern of discrimination or harassment. (Pl's. Resp. 1).

As it relates to Plaintiff's sexual harassment claims, plaintiff has the better of the argument. Under both Michigan law (the Elliott-Larsen Civil Rights Act) and federal law (Title VII), although claims regarding events that occurred before the relevant statutory period cannot form the basis of a lawsuit, *see Brown v. Unified Sch. Dist. 501*, 465 F.3d 1184 (10th

Cir. 2006) (Title VII); *Garg v. Macomb Cty. Cmty. Health Serv.*, 696 N.W.2d 646, 659 (Mich. 2005) (ELCRA); Mich. Comp. Laws § 600.5805 (2009), such evidence is admissible when relevant in accordance with the traditional rules of evidence and the trial court's discretion to determine whether a hostile work environment exists. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977); *Campbell v. Dep't of Human Serv.*, 780 N.W.2d 586, 590-92 (Mich. Ct. App. 2009). In other words, this evidence is relevant as background to put the sexual harassment claims in context.

The court will therefore consider all of plaintiff's allegations — including those that predate March 11, 2011, and March 11, 2013 — as background to determine whether there is a genuine issue of material fact showing a pattern of discrimination or harassment. As it relates to the remainder of plaintiff's claims, however, defendants are correct that the time-barred events cannot be considered. *Brown*, 465 F.3d 1184; *Garg*, 696 N.W.2d at 659.

**B. Counts III and VI – Sexual Harassment (Title VII and ELCRA)**

To establish a prima facie case of hostile work environment sexual harassment under Title VII, an employee must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual conduct or communication; (3) the conduct or communication occurred because of her sex; (4) the unwelcome sexual conduct was severe or pervasive enough so as to affect the terms and conditions of employment and create a hostile work environment; and (5) employer liability. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999); *Lavack v. Owen's World Wide Enter. Network*, 409 F.Supp.2d 848, 855 (E.D. Mich. 2005). Under the Elliott-Larsen Civil Rights Act, an employee must demonstrate the first four elements in addition to showing that the conduct or communication was actually sexual in nature (not simply based on gender) as well as respondeat superior. *Haynie v. State*, 664 N.W.2d 129 (Mich. 2003); *Radtke*, 501 N.W.2d. 155. By contrast, under

Title VII, the alleged conduct or communication need not be overtly sexual, so long as it stems from an "anti-female animus"; put differently, it suffices that the employee would not have suffered such conduct but for the fact that she is female. *Williams*, 187 F.3d at 565-66.

Here, there is no dispute that plaintiff is a member of a protected class (element one), or that the conduct and communications occurred (element two). Moreover, defendants do not challenge employer liability (element five and ELCRA's respondeat superior). The court considers whether plaintiff has established a genuine issue of material fact that the harassment occurred because of her sex (element three) and that the harassment was severe and pervasive (element four). Ultimately, the court concludes that plaintiff has established genuine issues of material fact as to both elements, rendering summary judgment improper on the sexual harassment claims.

### 1. Whether the Conduct Occurred Because of Sex (Element Three)

With regard to the third element, defendants argue that plaintiff cannot establish that the conduct and communications at issue were directed at her because of her sex. (Defs.' Mot. for Summ. J. 13-14). Viewing the evidence in a light most favorable to plaintiff, however, the court disagrees. There is, at a minimum, a genuine issue of material fact that the alleged harassment occurred because of plaintiff's sex.

The Supreme Court has explained that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). A trier of fact "might reasonably find such discrimination . . . if a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.* "An inference of discrimination is 'easy to draw' with male-female sexual harassment. In these traditional claims, 'it is reasonable to assume'

that the harassment would not have been done to members of the same sex." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 467 (6th Cir. 2012) (internal citations omitted).

Plaintiff has proffered sufficient evidence from which a jury could infer that the alleged harassment occurred "because of" her sex. Many of the comments allegedly made directly to plaintiff or to her co-workers about her were explicitly sexual in nature. For example, Wendel allegedly told plaintiff's co-workers that he had a "hard on all day" working with plaintiff and that he dreamt about having sex with her. Garrity allegedly told plaintiff that she looked "so hot today" and was "making [him] fuckin' horny." A jury may infer from these types of sexual comments made by male co-workers that the alleged harassment occurred "because of" plaintiff's sex.

Moreover, plaintiff's testimony is that the alleged sexual harassment also involved instances where male supervisors invaded her personal space. For example, Garrity allegedly touched plaintiff's rear end four-to-six times when leaning over her computer. Stover allegedly forced plaintiff to touch his abdominals to see how "fit" he was, despite plaintiff voicing her objections to Stover forcing her hand onto his body. Coupled with the sexual nature of the comments made to plaintiff, a jury may infer from this evidence that the alleged harassment occurred "because of" sex. In other words, based on these actions, the jury may infer that the actions taken by plaintiff's male co-workers and supervisors "would not have been done to members of the same sex." *Wasek*, 682 F.3d at 467. Defendants, therefore, are not entitled to summary judgment on the grounds that the alleged harassment did not occur "because of" plaintiff's sex.

### 2. Severe and Pervasive Hostile Work Environment (Element Four)

Defendants also challenge whether plaintiff has established a question of fact that the alleged harassment was severe and pervasive to amount to a hostile work environment.

Defendants argue that the conduct alleged by plaintiff amounts only to "teasing and game playing" and is insufficiently severe and pervasive to constitute a hostile work environment. The court disagrees. Genuine factual issues exist as to whether the alleged harassment was objectively severe and pervasive, and, whether plaintiff subjectively perceived the harassment as being severe and pervasive.

The Title VII and ELCRA claims are analyzed under the same analytical framework except that, under the ELCRA, conduct or communications must inherently pertain to sexual relations. *See Corley v. Detroit Bd. of Educ.*, 681 N.W.2d 342, 345 (Mich. 2004) (comments and threats of adverse job action stemming from the plaintiff's former intimate relationship with her supervisor insufficiently sexual under ELCRA). Under both the ELCRA (considering only inherently sexual conduct/communications) and Title VII, Plaintiff has established a genuine issue of material fact that defendants' conduct/communications were severe and pervasive amounting to a hostile work environment.

The existence of a hostile work environment is evaluated both objectively and subjectively through a totality-of-the-circumstances approach. The conduct must be so extreme that a reasonable person would find the working environment to be abusive, and the plaintiff must subjectively perceive that the conduct at issue has altered the terms and conditions of her employment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993); *see also Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986). The conduct does not have to be directed at the plaintiff, and the plaintiff need not be present at the time of the conduct but can learn of it afterward. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 500 (6th Cir. 2009) (citation omitted). Instances of alleged workplace harassment cannot be evaluated in isolation; in other words, courts look to the cumulative effect of the alleged harassment

through a totality-of-the-circumstances approach. *Curry v. SBC Commc'n, Inc.*, 669 F.Supp.2d 805, 834 (E.D. Mich. 2009).

Determining whether conduct is severe and pervasive is not subject to mathematical formula. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citation and internal quotation marks omitted). "[T]he workplace must be permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." *Id.* (citation omitted). When determining if sexual harassment is "ongoing," "commonplace," and "continuing," the plaintiff's testimony is enough to create a factual issue. *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998). An inability to recall all of the specific instances of harassment goes to the weight of the plaintiff's testimony, an issue for the fact finder. *Id.*

Another court in this district recently addressed a hostile work environment claim where the plaintiff testified that she was subjected to repeat unwanted physical contact as well as sexually harassing comments on a continual basis. *Meadows v. Wahler Auto. Sys., Inc.*, 45 F.Supp.3d 645, 656 (E.D. Mich. 2014). In *Meadows*, the plaintiff testified that, from October through December 2010, she was harassed on a daily basis by her supervisor, who constantly told her she had a "nice ass" and got "very upset" if plaintiff did not give him attention. *Id.* at 648. Plaintiff testified that, among other things, the supervisor constantly asked her to lift up her shirt so he could stare at her rear end, brushed up against her breast, and placed a dollar bill in her pocket "as a patron would do in a strip club—and did so in front of [plaintiff's] co-workers." *Id.* The court in *Meadows* determined that, under Sixth Circuit

precedent, these alleged actions were enough to require a fact finder to determine whether the sexual harassment was severe and pervasive.

The *Meadows* court cited multiple Sixth Circuit cases where it was determined that questions of fact existed for a jury to decide whether sexual harassment was severe and pervasive. First, the *Meadows* court cited *Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). In *Williams*, the plaintiff was subjected to "unwanted and humiliating sexual innuendo" by her supervisor. *Id.* Oftentimes, plaintiff's supervisor's actions involved an element of physical invasion. *Id.* For example, plaintiff's supervisor approached her while she was bending over and told her to "Back up; just back up." *Id.* In addition, co-workers made comments to the plaintiff such as, "Hey, slut" or "I'm sick and tired of these fucking women," which the Sixth Circuit categorized as not merely "mean and annoying treatment by co-workers," but instead offensive language going to the core of the plaintiff's "entitlement to a workplace free of discriminatory animus." *Id.* The Sixth Circuit also reasoned that "pranks" played on the plaintiff, such as locking her out of her work area, could not be viewed in isolation of the context of the alleged harassment. *Id.* The *Williams* court concluded that, viewing the totality of the circumstances, there was a genuine issue of material fact over whether the harassment was severe and pervasive.

Second, the *Meadows* court cited *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 352 (6th Cir. 2005). In *Clark*, the district court reversed the district court's grant of summary judgment to the defendant employer because the plaintiff presented an "ongoing pattern of unwanted conduct and attention" by [a] supervisor. *Id.* Specifically, the plaintiff "presented seventeen incidents of harassment by [the supervisor], including [an] incident where [the supervisor] tossed his vibrating pager between [plaintiff]'s legs when she was sitting in her cubicle[.]" *Id.*

-19-

Third, the *Meadows* court cited *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008). In *Hawkins*, four female employees alleged that they were subjected to a hostile work environment by management and co-workers. For example, one of the plaintiff's alleged that a co-worker told her, "I will suck your pussy but you got to suck my dick." *Id.* at 328. Moreover, another plaintiff recounted "numerous instances of touching—stating [a co-worker] touched her arms, rubbed her shoulders, and walked up close behind her—and that he regularly made 'lewd and explicit' comments." *Id.* The Sixth Circuit explained that the alleged sexual harassment was ongoing and continual, and the comments were "significantly more graphic, personal, and sexually explicit than the comments at issue in *Williams*[.]" *Id.* at 334. Moreover, the plaintiffs "recounted acts of touching and unwelcome physical contact that establish an element of physical invasion." *Id.* The plaintiffs' testimony, therefore, created a genuine issue of material fact whether the sexual harassment was severe and pervasive. *Id.*

This case, like *Meadows*, *Williams*, *Clark* and *Hawkins*, presents a scenario where a genuine issue of material fact exists as to the severity and pervasiveness of the alleged sexual harassment. Like these cases, the alleged sexual harassment involved in this case involves harassing comments as well an element of physical invasion. The totality of the evidence must be viewed in context through this lens. Moreover, like the cases cited above, plaintiff testified that the conduct and comments were ongoing and continuous. It is for the fact finder to judge her credibility, not the court on summary judgment. The court analyzes the severe and pervasive factor as it relates to the ELCRA and Title VII claims separately and in more detail below.

### a. The ELCRA Claim

Limiting the analysis to the inherently sexual comments and actions when considering the ELCRA claim, the alleged comments and conduct by Wendel and Garrity are enough to

allow a fact finder to determine whether the alleged sexual harassment was severe and pervasive. Therefore, this claim will proceed against Wendel, Garrity and Ford. However, there are no inherently sexual comments or conduct alleged to have been made by defendant Brudzinski. Therefore, the ELCRA claim will be dismissed against him.

As explained above, Plaintiff testified that, prior to 2010, she heard that John Balsam was confronted by another supervisor who accused Balsam of being sexually involved with plaintiff. Moreover, supervisor Terry Sikes told plaintiff that Pat Fisher accused Sikes of giving plaintiff special assignments in return for sexual favors. Fisher allegedly made "sexual comments and gestures" about plaintiff including commenting on her rear end and tight pants. Plaintiff's allegations relating to Thomas Garrity are also inherently sexual. As explained, plaintiff alleges that Garrity (1) deliberately touched her backside four to six times, each time in the same manner when leaning over her computer screen; (2) placed a black-colored part on her workstation and, laughing, asked, "so, is this how you like your men, black, huh?"; (3)  told plaintiff that the male workers spoke to her because they wanted to have sex with her; and (4) stated to plaintiff that she looked "so hot today" and was "making [him] fuckin' horny." Finally, there are allegations relating to defendant Wendel that are also inherently sexual. As explained above, plaintiff testified that Wendel told other employees that he "had a hard-on all day" working with plaintiff, that he believed plaintiff's husband was unable to sexually satisfy her and that he "would love an opportunity because he knows he can"; and that he dreamt that he had sex with plaintiff and "it was so good [he] came back for seconds. When considering the inherently sexual communications/conduct under the ELCRA and the case law explained above, there is a genuine issue of material fact whether plaintiff was subjected to a severe and pervasive hostile work environment by defendants Wendel, Garrity and Ford. This is for a jury to decide.

However, plaintiff has not proffered any evidence that defendant Brudzinski's alleged comments/actions were inherently sexual. Therefore, Brudzinski is entitled to summary judgment on the ELCRA claim.

### b.  The Title VII Claim

When expanding the scope to include comments and actions that are not "inherently sexual," as permitted under Title VII, there is even more of a genuine issue of material fact whether the alleged harassment was severe and pervasive, and none of the defendants are entitled to summary judgment. Defendants' actions, when viewed in a light most favorable to plaintiff, rise to the level of harassment found to be sufficient to create a jury question in *Meadows*, *Williams*, *Clark* and *Hawkins*.

In addition to the inherently sexual comments, plaintiff has alleged a workplace environment where she was constantly harassed by co-workers and supervisors because of her sex. The non-inherently sexual comments and conduct explained above is to be considered in context when taking the totality-of-the-circumstances approach required under Sixth Circuit precedent. Plaintiff's testimony and her constant complaints to Labor Relations about the workplace environment are sufficient to allow a jury to decide whether the harassment was severe and pervasive.

### c.  Defendants' Inapposite Case Law

Defendants argue that plaintiff suffered "teasing" or "game-playing" that does not rise to the level of severe and pervasive harassment. Indeed, defendants argue that the Sixth Circuit has found "conduct far more severe and pervasive than that alleged here to be legally insufficient to create a hostile work environment." (Defs.' Mot. at 15, Doc. #34 at 25). The court disagrees. The cases cited by defendants, including *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 790 (6th Cir. 2000), *Gwen v. Regional Transit Auth.*, 7 F. App'x 496 (6th

Cir. 2001), and *Burnett v. Tyco Corp.*, 203 F.3d 980, 985 (6th Cir. 2000), did not involve situations where there was an alleged ongoing element of physical invasion in addition to sexual comments. Rather, these cases involved situations where the plaintiffs had alleged isolated incidents of harassment, for the most part involving offhand comments. Here, plaintiff's testimony establishes ongoing comments and an element of physical invasion from which a jury could reasonably infer a hostile work environment.

Defendants also cite Judge Patrick Duggan's opinion in *Stoudemire v. GMC*, No. 05-74086, 2007 WL 496477 (E.D. Mich. Feb. 12, 2007).  In *Stoudemire*, the plaintiff identified nine instances of sexual harassment:

> (1) an employee named Don briefly grabbed her rear-end one time; (2) an unidentified employee swatted her rear-end one time with a plastic rope; (3) a co-worker patted her on the rear-end one time to wake her up from a nap; (4) a co-worker grabbed his crotch and shook it in her direction; (5) another employee told her he could not "f-ing stand her and nobody else, too" and called her a "Bitch"; (6) a co-worker "put" his foot on her leg; (7) employees threw bolts at her; (8) her supervisor Bobby Keane referred to her as "bubba"; and (9) Keane made a comment about the length of her pubic hair.

*Id.* at *1. Judge Duggan determined that the "incidents Plaintiff described during her deposition to support her claim of sexual harassment were isolated and, for the most part, constituted simple name-calling." *Id.* at *4.

In contrast with *Stoudemire*, the allegations in this case involved an aspect of physical invasion that, if believed by a jury, is far more serious than the conduct in *Stoudemire*. Moreover, plaintiff's testimony supports the view that the harassment was ongoing and continuous. This case is different than *Stoudemire*.

In sum, plaintiff's sexual harassment claims survive summary judgment except that defendant Brudzinski is entitled to summary judgment on the ELCRA claim

**C. Counts I and V – Gender Discrimination (Title VII and ELCRA)**

Next, defendants argue that they are entitled to summary judgment on the gender discrimination claims. They are correct.

The standard for establishing a prima facie case of gender discrimination is the same under both Title VII and the Elliott-Larsen Civil Rights Act. *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012); *see also Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001). A plaintiff must establish that (1) she was a member of a protected class; (2) she was subject to an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class or similarly situated employees outside the protected class were treated more favorably. *Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008).

As explained, plaintiff argues that two male employees with the same medical restrictions as her were treated more favorably than she was treated by the defendants insofar as they were not reassigned to do the same work as her. Plaintiff has not established a question of fact as to the second and fourth elements of her gender discrimination claims, assuming without deciding that she satisfies the remaining elements.

First, plaintiff fails to show that she was subjected to an adverse employment action. An employment action generally requires changes in hours or salary in order to qualify as adverse. *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876 (6th Cir. 1996). Plaintiff has not identified any kind of cognizable employment action taken against her by defendants. Being temporarily reassigned to other tasks due to a shortage of work in plaintiff's department does not involve a change in hours or salary. This is particularly true in light of the fact that employees in the packaging department were reassigned to perform other work as an alternative to being sent home for the day. (Defs.' Ex. 5, ¶ 13). In short, plaintiff fails to

establish a genuine issue of material fact that she was subjected to an adverse employment action because of her gender.

Second, even if plaintiff established an adverse employment action, she has not shown that she was treated any differently than "similarly situated" employees. It is Ford's practice to reassign employees to perform other work when needed instead of being sent home for the day. This is done on the basis of seniority — junior employees are reassigned before the more senior employees. (Defs.' Ex. 5, ¶ 13). Plaintiff fails to show how this was any different for her co-workers. To show that she was treated differently than similarly situated employees, plaintiff bears the burden of pointing to employees who are "similarly situated in all respects." *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 768 (6th Cir. 2004). In other words, the "similarly situated" employees must have been under the supervision of the same management, evaluated by the same standards, and engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment." *Gragg*, 373 F.3d at 768; *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Comiskey*, 40 F. Supp. 2d 877.

Here, plaintiff compares herself to two employees (James Smith and Paul Bagwell) who she claims were treated differently and were not reassigned like she was to complete work allegedly against her restrictions. However, as defendants argue, Smith and Bagwell are not "similarly situated in all respects" with plaintiff. As to Smith, he had three months more seniority than plaintiff so it make sense that plaintiff would be reassigned to complete other tasks before he would be reassigned. (Defs.' Ex. 5, ¶ 8). As explained above, defendants' reassignment of employees to complete needed tasks occurs based on the level of the employee's seniority. Smith's three months of seniority constitutes "differentiating . . . circumstances." *Mitchell*, 964 F.2d at 583. And as it relates to Bagwell, he worked under

different supervisors in a different department under different medical restrictions. (Defs'. Ex. 5 ¶ 21). These differences show that Bagwell is not "similarly situated in all respects" with plaintiff. Plaintiff offers no other evidence to support her gender discrimination claim. Thus, defendants are entitled to summary judgment on the gender discrimination claims.

**D. Counts IV and VII – Sexual Harassment Retaliation (Title VII and ELCRA)**

Defendants also seek summary judgment on plaintiff's sexual harassment retaliation claims. Like the gender discrimination claims, defendants are entitled to summary judgment.

To establish a prima facie case of sexual harassment retaliation under Title VII and the ELCRA, a plaintiff must show that: (1) she engaged in protected activity; (2) the employer knew about the plaintiff engaging in the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 675 (6th Cir. 2013); *Wasek v. Arrow Energy Serv., Inc.*, 682 F.3d 463, 468-69 (6th Cir. 2012).

In the absence of direct evidence of retaliation, the well-familiar *McDonnell Douglas* burden shifting framework applies to Title VII and ELCRA cases. *Cuddington v. United Health Serv., Inc.*, 826 N.W.2d 519, 525-26 (Mich. Ct. App. 2012). That is, once a plaintiff establishes a prima facie case of retaliation, the defendant must offer an alternative, non-retaliatory reason for the employment action. *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). If the employer proffers a non-retaliatory reason for the employment action, the plaintiff must produce enough evidence for a reasonable juror to conclude that the employer's legitimate reason is pretextual because it either: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* at 597.

Plaintiff's sexual harassment retaliation claims fail for two reasons. First, assuming that she could meet the first three elements of her retaliation claims, plaintiff has not proffered any evidence from which a reasonable jury could conclude that there was a causal connection between plaintiff's protected activity and an adverse employment action. Title VII and the ELCRA apply a but-for causation standard to retaliation claims: the employee must show that the allegedly adverse employment action would not have occurred but for her complaint. *Univ. of Texas S.W. Medical Center v. Nassar*, 133 S. Ct. 2517 (2013); *Beard v. AAA of Mich.*, 593 F. App'x 447 (6th Cir. 2014); *Williams v. Serra Chevrolet Auto., LLC*, 4 F.Supp.3d 865 (E.D. Mich. 2014). Temporal proximity is generally not sufficient on its own to establish causation, unless the adverse action occurs very close in time to the protected activity. *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

Here, plaintiff focuses on the series of eight disciplines issued to her over a period of ten months, which, for purposes of this motion, the court assumes without deciding constitute adverse employment actions. Ultimately, however, plaintiff encounters a causation problem. She has not proffered any evidence to support that she was retaliated against by being disciplined because of reporting sexual harassment. The court looks no further than plaintiff's complaint to point out the causation problem. The complaint alleges that plaintiff was "disciplined only after having complained about being *worked against her restrictions*." (Compl. ¶ 21e) (emphasis added). Despite alleging in the complaint that the retaliation occurred because of complaining about work restrictions, plaintiff now argues that she was retaliated against for complaining about sexual harassment. Her argument is inconsistent with the complaint. Moreover, the series of disciplines plaintiff contends occurred because of her complaints about sexual harassment began in April 2012, several months before plaintiff's report to Labor Relations about sexual harassment. (Pl's. Ex. 3). Finally, plaintiff

admits that the problems documented in the disciplines actually occurred undermining her contention that the disciplines were taken in retaliation for reporting sexual harassment. (*See* Pl.'s Exs. 3, 12, 13, 22, 23, 25, 26, 29; Defs.' Ex. 14, ¶¶ 3-5, Exs. A-I; Pl's. Dep. 26-28, 578-88, 599-608).

Second, even if plaintiff established a prima facie case of sexual harassment retaliation, she has not rebutted defendants' legitimate non-discriminatory reason for imposing the disciplines. Defendants argue that plaintiff received the disciplines because she failed to follow her supervisors' instructions, incorrectly packed parts, and fell below union-established productivity standards. (*See* Pl.'s Exs. 3, 12, 13, 22, 23, 25, 26, 29; Defs.' Ex. 14, ¶¶ 3-5, Exs. A-I). As explained, plaintiff effectively admits that the underlying actions forming the basis of the disciplines actually occurred. She has failed to show that defendants' legitimate non-discriminatory reason for imposing the disciplines is pretext for discrimination. She admits that the disciplines are based in fact, and she proffers no evidence to show that the underlying basis for the disciplines did not actually motivate defendants' conduct or that her conduct was insufficient to lead to the disciplines. For these reasons, defendants are entitled to summary judgment on the sexual harassment retaliation claims.

**E. Count II – Gender Retaliation (Title VII)**

Defendants also seek summary judgment on plaintiff's gender retaliation claim.

Establishing a prima facie case of gender retaliation under Title VII requires the same four elements as sexual harassment retaliation: (1) the plaintiff engaged in protected activity; (2) the employer knew about the plaintiff engaging in the protected activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action. *Fuhr*, 710 F.3d at 675 (6th Cir. 2013).

Plaintiff has not established a prima facie case of gender retaliation. Plaintiff has not identified when she reported or complained of alleged gender discrimination prior to filing this lawsuit. Nor could Ford's human resources manager find any record of plaintiff complaining about gender retaliation. (Defs.' Ex. 5, ¶¶ 2, 9).

Likewise, plaintiff has not identified any adverse retaliatory action taken against her as a result of complaining about gender discrimination. As explained, plaintiff's complaint alleges that the disciplines against her were because she reported being forced to work against her medical restrictions. Nothing in the record supports a gender retaliation claim. Indeed, plaintiff's response to defendants' motion for summary judgment fails to point to any specific retaliatory action taken by defendants as a result of plaintiff complaining about gender discrimination. Plaintiff fails to address the gender discrimination claim in any meaningful detail. Defendants will be granted summary judgment on this claim.

**F. Counts VIII and IX – Disability Retaliation (ADA and PWDCRA)**

Next, defendants seek summary judgment on plaintiff's disability retaliation claims. The court will grant defendants summary judgment on these claims.

The ADA and PWDCRA apply the same *McDonnell Douglas* burden shifting framework as Title VII and ELCRA cases. *MacDonald v. United Parcel Serv.*, 430 F. App'x 453, 463 (6th Cir. 2011). The ADA and PWDCRA effectively mirror each other, and courts typically analyze the claims together. *Donald v. Sybra*, 667 F.3d 757, 764 (6th Cir. 2012). Thus, to establish a prima facie case of retaliation under either statute, the plaintiff must show that: (1) she engaged in protected activity by either opposing an ADA/PWDCRA violation or participating in a proceeding under the statute, (2) the employer knew that the plaintiff engaged in protected activity, (3) the plaintiff suffered an adverse job action, and (4) there was a causal connection between the plaintiff's protected activity and adverse job action.

*Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014); *Aho v. Mich .Dep't of Corr.*, 688 N.W.2d 104, 108 (Mich. Ct. App. 2004).

A plaintiff need not actually be disabled to assert a claim under the ADA or PWDCRA. *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007); *Barrett v. Lucent Tech.*, 36 F. App'x 835, 840 (6th Cir. 2002). The standards for protected activity and adverse job actions are the same under the ADA and PWDCRA as under Title VII and the ELCRA. *Vorachek v. Sec. Fed. Credit Union*, 2009 WL 4506440, at *6 (E.D. Mich. Dec. 1, 2009); *see also Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 682-83 (6th Cir. 2014).

Plaintiff's disability retaliation claims fail because she has not established a prima facie case. First, plaintiff has not identified any materially adverse job actions taken against her as a result of her alleged engagement in a protected activity. Although plaintiff repeatedly claims that she was assigned to jobs outside her department, plaintiff had no permanent work assignment, and she was qualified for these other assignments because of her hi-lo license and seniority. (Defs.' Ex. 5, ¶ 12; Pl.'s Ex. 12). In her second EEOC charge under which this lawsuit is brought, plaintiff also identifies being scheduled for an independent medical exam as retaliation for filing the first EEOC charge. However, plaintiff has not established that any relevant decision maker knew of her first EEOC charge, and, even assuming that they did, "[t]he ADA permits an employer to require a medical examination to determine qualifications for the job and for the health and safety of employees." *Coulson v. The Goodyear Tire and Rubber Co.*, 31 F. App'x 851, 855 (6th Cir. 2002) (*citing Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 813 (6th Cir.1999).

Second, plaintiff cannot meet her burden in showing that any adverse job action was causally related to protected activity. The court applies a "but-for" standard for causation meaning that the adverse employment action would not have occurred but for the employee

engaging in the protected activity. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015); *Lewis v. Humboldt Acquis. Corp.*, 681 F.3d 312 (6th Cir. 2012) (ADA); *Ingram v. Henry Ford Health Sys.*, No. 13-11567, 2014 WL 1584355 (E.D. Mich. Apr. 21, 2014) (ADA and PWDCRA). Plaintiff generally alleges that she was assigned to work that violated her medical restrictions or was above her skill level, but she fails to link these assignments to any particular complaint or request for accommodation regarding her knee injury. (*See* Compl. ¶ 21; Pl.'s Resp. 24-25). Instead, the record reflects that plaintiff did not believe she was qualified for the tasks; there is no indication in the record that plaintiff did not want to complete the tasks because she believed she could not do so physically. Considering the variety of other legitimate factors that may have been dispositive or even influential in management's decisions to assign plaintiff to these jobs — including plaintiff's seniority level and job classification (determined by the union), her department's merger with another department (requiring fewer employees to perform a wider range of assignments), the lack of availability of small hand-pack work (plaintiff's preferred assignment), and the fact that all of the assignments given to plaintiff were within her medical restrictions — plaintiff has not met the but-for causation standard. (Defs.' Ex. 5, ¶ 7-8, 18, Ex. A, ¶ 10-11, 13, Ex. B; Defs.' Reply 10; Defs. Ex. 7, ¶ 7, Ex. A, ¶ 11, Ex. B, ¶ 20, Ex. C).

The complaint alleges that plaintiff was "disciplined only after having complained about being worked against her restrictions." Compl. ¶ 21. Assuming this to be true, temporal proximity generally is insufficient to show a causal connection between protected activity and retaliation. *Mickey*, 516 F.3d at 523. In addition, as explained above, in responding to defendants' motion for summary judgment plaintiff argues that the disciplines occurred because she complained about sexual harassment. And, as explained, plaintiff admits that

the underlying issues in the disciplines actually occurred, providing a legitimate explanation for the reprimands. (*See* Pl.'s Exs. 19, 22, 23, 25).

Even if plaintiff had established a prima facie case of ADA and PWDCRA retaliation, defendants offer a variety of alternative, legitimate reasons for plaintiff's assignments, as explained above. Plaintiff has not met her burden in showing that defendants' legitimate reasons for assigning her to a certain task were pretext for discrimination. Defendants are entitled to summary judgment on the ADA and PWDCRA retaliation claims.

## IV. CONCLUSION

For the reasons explained above, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Specifically, defendants' motion is granted as to all claims except the Title VII and ELCRA sexual harassment claims. However, as to the ELCRA sexual harassment claim, summary judgment is GRANTED in favor of defendant Brudzinski. The court will issue a scheduling order charting the future course of the case.

**IT IS SO ORDERED.**

Dated: August 11, 2015                      s/George Caram Steeh
                                            United States District Judge


CERTIFICATE OF SERVICE

Copies of this document were served upon attorneys/parties
of record on date above by electronic and/or ordinary mail.

s/Marcia Beauchemin
Case Manager